UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANN C. KERN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 1:07-cv-1529-DFH-TAB |
| | ) |
| WILLIAM R. RADEZ, JR., | ) |
| | ) |
| Defendant. | ) |

ENTRY ON MOTION FOR DEFAULT JUDGMENT

Attorney William Radez Jr. made a serious mistake in preparing trust documents for his clients Ted Holland and his wife Barbara DeMasie Holland. The person who will be harmed by the mistake is plaintiff Ann Kern, Ted Holland's daughter by a previous marriage. The people who will benefit from the mistake are Barbara's five children by a previous marriage.

Plaintiff Kern brought this diversity action to recover damages from attorney Radez for his mistake. Radez chose not to answer the complaint. Default has been entered against him under Rule 55(a) of the Federal Rules of Civil Procedure. Radez has not contested liability, but he argues that any award of damages would be speculative until Barbara dies. The court has held two evidentiary hearings on the issue of damages or other remedy. The court heard testimony from a certified

public accountant on behalf of plaintiff and later from defendant Radez.  The court now states its findings of fact and conclusions of law.

Because defendant Radez did not answer the complaint and defaulted, the court takes as true the well pleaded allegations in the complaint that establish liability, though damages must still be proved.  See *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 602-03 (7th Cir. 2007) (vacating award of damages after entry of default where evidence of damages was too conclusory); see also *Yang v. Hardin*, 37 F.3d 282, 286 (7th Cir. 1994) (reversing denial of damages after entry of default where district court heard evidence on liability issues); *Black v. Lane,* 22 F.3d 1395, 1399 (7th Cir. 1994) (reversing dismissal of claim after entry of default); *United States v. DiMucci*, 879 F.2d 1488, 1497 (7th Cir. 1989).  The court also makes findings upon the basis of the evidence presented at the two hearings on plaintiff's motion for default judgment.  Substance rather than labels shall govern whether a matter is treated as a finding of fact or a conclusion of law.

Attorney Radez has practiced law in Indiana since 1985.  He focuses on the area of elder law.  An important part of elder law is estate planning, particularly with an eye to minimizing avoidable tax liabilities and assuring that elderly clients will have assets available if possible to provide for their health care and related needs.

Radez conferred with Ted Holland and Barbara DeMasie Holland, and based on those discussions, Radez prepared documents to create a family bypass trust upon the death of the first of the two spouses. In essence, the assets of the deceased spouse would be put into an irrevocable trust for the benefit of the surviving spouse, subject to restrictions as set forth below. Upon the death of the second spouse, the trust would be distributed to the residual beneficiaries designated in the trust instrument.

Plaintiff alleged, and Radez concedes, that Ted and Barbara Holland instructed him that if Ted died first, his daughter, plaintiff Ann Kern, should be the sole residual beneficiary of the trust to be created with his assets. In other words, upon Barbara's death, Ann should receive 100 percent of the remaining trust assets. But Radez made a mistake in the drafting. Under the terms of the now irrevocable trust, upon Barbara's death Ted's assets shall be distributed equally among Barbara's five children and Ann, giving Ann only one-sixth of the remaining assets rather than all of them.[1]

Ted died on December 30, 2004. At that time, the irrevocable family bypass trust was created with assets worth $952,218.26.

---

[1] From the record, it appears possible that Radez's mistake might also have resulted in Ann receiving one-sixth of Barbara's separate assets, rather than zero as intended by Ted and Barbara. The parties have not pressed the point and the court deems any possible set-off for Radez's benefit to have been waived.

The problem here is posed by the uncertainty about the future value of the assets at the time of Barbara's future death. Radez argues that Ann has not yet suffered any damages and that any calculation at this time would be speculative. The problem is posed by Barbara's rights to draw from the principal and interest until she dies. Under the trust, Barbara has the right to all income and principal "as is necessary [for her] health, education or support to maintain [Barbara's] accustomed manner of living." Compl. Ex. B §§ 5.2, 5.3. Under the trust, the determination of what is necessary is left to Barbara's discretion. *Id.*, see also Compl. Ex. B § 5.4. Barbara also has the absolute right to withdraw the greater of $5,000 or five percent of the trust property each year.

Based on Barbara's rights to withdraw substantial amounts, and perhaps even all, of the trust principal, Radez contends the court would have to speculate to determine an amount to award Ann as compensation for his mistake. In essence, he contends that Ann's claim is not yet even ripe.

Ann relies on the opinion of CPA Richard Wheeler, who offered an estimate of the likely value of the lost five-sixths interest in the trust. He based his estimate on several key assumptions. He assumed that Barbara is likely to live 12.7 years after Ted's death, based on Barbara's age and standard life expectancy tables. (He did not use any individual information about her health, and Radez has not offered any evidence on that subject.) Wheeler assumed a five percent

-4-

average annual growth in asset value.  He used the same five percent figure to discount to present value the future nominal value of trust assets.

The most controversial part of Wheeler's calculations addressed Barbara's right to withdraw income and principal.  Wheeler first determined the actual withdrawals by Barbara for the first three years of the trust's existence and calculated the annual average withdrawal.  He then assumed that she would continue to withdraw that same amount each year, with a five percent annual increase in the withdrawals.  Based on those calculations, Wheeler estimated that the present value of the assets the trust is likely to have upon Barbara's death is $567,422.72.  Five-sixths of that amount is $472,852.27, which is the amount Ann argues should be awarded to her.

Although he has conceded liability, Radez argues that Ann has not yet suffered an injury and there is insufficient basis for judgment to be entered in her favor.  Radez argues that Ann will not be injured, if at all, until Barbara dies and the remaining value of the trust is known.  Ann is a remainder beneficiary.  Even if Ann had been properly designated as the sole remaining beneficiary, it is possible that nothing would have remained in the trust after Barbara's death and that Ann would have received nothing.  As Radez puts it, "100% of nothing is the same as 1/6 of nothing." Dkt. No. 32 at 3.  Under his argument, Ann's claim has not accrued, an award of damages would be speculative, and her claim should be dismissed as premature.  The court disagrees.

Radez cites *Pflanz v. Foster*, 888 N.E.2d 756 (Ind. 2008), in which the Indiana Supreme Court held that a landowner's claim for contribution against prior owners and users of the land to pay for environmental remediation did not ripen until the landowner was ordered by the government to spend money to clean up the property. The court wrote:

> In the American legal system, demonstrated harm is an indispensable element of virtually every type of civil claim. In cases ranging from contract to tort to medical malpractice, a claimant cannot recover a monetary judgment unless he has suffered actual damage. The law does not usually permit monetary recovery for claims solely involving future damages; rather, some damage must have already begun to occur. This notion that the statute of limitation begins to run when all the elements of a cause of action can be shown (including whether some damages have been felt) is part of how we determine when a cause "accrues." See *Doe v. United Methodist Church*, 673 N.E.2d 839, 842 (Ind. Ct. App. 1996) ("For a cause of action to accrue [for limitation purposes], it is not necessary that the full extent of the damage be known or even ascertainable but only that some ascertainable damage has occurred.").

*Pflanz*, 888 N.E.2d at 758-59.

Indiana cases in attorney malpractice contexts more similar to this case point in the opposite direction. The Indiana Court of Appeals dealt with a problem similar to this case in *Carlson v. Sweeney, Dabagia, Donoghue, Thorne, Janes & Pagos*, 868 N.E.2d 4 (Ind. App. 2007), which was an attorney malpractice case. The alleged negligence was that the attorney had drafted a trust that resulted in the very tax liability that the trust was intended to avoid. But when the lawsuit was filed, the IRS had not yet assessed any tax liability. The court faced the issue whether the lawsuit was premature:

-6-

> We recognize the problems inherent with allowing claims to proceed where the extent of damages is uncertain, and in all likelihood will not be ascertainable until the IRS assesses taxes on the estate of the later to die of Norman Jr. and Margaret. However, to disallow suits until the IRS has assessed tax liability leads to other problems especially apparent in the case of negligently drafted trust documents on which the IRS will not assess taxes until the death of relatively young beneficiaries. This later approach "essentially permits lawsuits on the basis of an attorney's negligence for an indefinite period of time," and "does nothing to further the goals of prompt presentation of claims or seasonable notice to defendants." *Godby*, 837 N.E.2d at 151 (quoting *Silvers v. Brodeur*, 682 N.E.2d 811, 817 (Ind. Ct. App. 1997), trans. denied ) (discussing the rationale for allowing criminal defendants to bring malpractice claims against their attorneys before being exonerated or receiving other relief from conviction). Courts face a "Catch-22" when deciding whether to allow claims such as the one here to proceed before the IRS actually makes its tax assessment. Our supreme court has chosen to allow claims to proceed before the assessment while damages may not be definitely ascertainable. Therefore the Carlsons' suit is not premature for lack of ascertainable damages.

*Carlson*, 868 N.E.2d at 22 (internal citations omitted).[2] Applying this reasoning to this case lends strong support to Ann's position that her claim is ripe now and that she is entitled now to a reasonable estimate of damages caused by the attorney's negligence.

The case of *Shideler v. Dwyer*, 417 N.E.2d 281 (Ind. 1981) is also helpful here. In *Shideler*, the plaintiff was the intended beneficiary of a will, but the plaintiff alleged that the lawyer who drafted the will made an error and wrote a provision for the plaintiff's benefit that was only precatory and not enforceable.

---

[2]The Indiana Supreme Court granted transfer in *Carlson* and reversed in part on other grounds. See 895 N.E.2d 1191 (Ind. 2008). The grant of transfer technically vacated the Court of Appeals decision, see Ind. App. Rule 58(A), but this court finds its analysis a persuasive statement of Indiana law on the timing issues that were left untouched by the Indiana Supreme Court.

The issue presented to the Supreme Court was whether the legal malpractice claim was barred by the statute of limitations. The plaintiff argued that she had not been injured until the probate court eventually held that the clause for her benefit was not enforceable. The Supreme Court disagreed and held that the injury had occurred and the statute of limitations began to run when the testator died and the alleged error became impossible to repair:

> When did damage to Plaintiff result from Defendant's alleged negligence? Not when the Will was drafted or executed, because it had to await the death of Moore before it could have any dispositive effect. But at his death, the instrument was operative; and, just as the negligent construction of the bridge in *Pearson* became irremediable with its collapse under Pearson's weight, the wrong, if any, set in motion with the drafting of Moore's Will became irremediable with his death.

*Shideler*, 417 N.E.2d at 290. *Shideler* did not present any problem in determining the amount of damages, but its reasoning strongly suggests that Ann would have lost on a statute of limitations defense if she had adopted the approach advocated by Radez here and had waited to sue Radez until after Barbara's death some time in the future. Implicit in that message is the court's duty to provide a reasonable estimate of damages based on the evidence presented.

*Estate of Spry v. Batey*, 804 N.E.2d 250 (Ind. App. 2004), provides a further illustration of the problem in an attorney malpractice case. Spry had been killed in an automobile accident, and her estate settled with the driver of the vehicle. The estate then filed suit against the tavern where the driver had been drinking. When the tavern learned of the prior settlement with the driver, it argued that the

-8-

settlement also released claims against the tavern and demanded that the case be dismissed. The estate's attorneys notified the estate administrator of this demand and recommended that the case against the tavern be dismissed. The estate instead obtained new counsel who fought the dismissal and eventually lost to the tavern. The estate then sued the original attorneys for malpractice. The issue was when the two-year statute of limitations began to run. The possible times were when the estate entered into the settlement with the driver, or later when the estate's attorneys told the estate administrator of the problem, or much later when the estate lost in court to the tavern.

The Indiana Court of Appeals held that the statute began to run when the estate administrator was told of the problem, not when the later loss in court occurred. The court reasoned that the negligence and injury had occurred at the time of the ill-advised settlement and that the estate discovered the wrong when the attorneys told the administrator of the problem. *Id.* at 254. The statute of limitations clock began to run then, even though the amount of damages could not have been ascertained without much more time and effort. The reasoning of *Spry* also indicates that the court should do its best to estimate damages at this time rather than postpone the dispute to some future date.

In cases involving personal injury, the types of uncertainty identified by Radez arise all the time. Courts and juries do their best to estimate future lost wages, future medical expenses, future pain and suffering, and future loss of

-9-

enjoyment of life all the time. These estimates are not immune from mistake, but reasonable approximations are better than the alternatives of denying relief altogether or postponing relief to some future date.

The Indiana Court of Appeals made this point in *Ashland Pipeline Co. v. Indiana Bell Telephone Co.*, 505 N.E.2d 483 (Ind. App. 1987), in affirming a damage award based on economic estimates for cutting a telephone cable:

> The use of economists, who rely upon statistical analysis, has been utilized in wrongful death and personal injury suits for some time, and damage awards based on their testimony have been approved by the courts. *Richmond Gas Corp. v. Reeves* (1973), 158 Ind. App. 338, 302 N.E.2d 795; *State v. Daley* (1972), 153 Ind. App. 330, 287 N.E.2d 552, trans. denied. Factors such as mortality tables (used to project life expectancy), rate of inflation, present value, and projected wages and earnings are relevant and admissible evidence. Based upon these factors, an economist is permitted to testify as to the economic value of the tort victim, although the factors relied upon may never come to pass. The person may not live to the average life expectancy. He may have become unemployed. The rate of inflation may drastically fluctuate. Nevertheless, such analysis is permitted and utilized.

*Ashland Pipeline Co.*, 505 N.E.2d at 490. In the cited *Richmond Gas* case, the court affirmed a wrongful death award based on the mortality tables for the 26 year old victim and projected earnings over his entire career. See *Richmond Gas*, 302 N.E.2d at 812-13. The cited *Daley* case involved similar estimates of lifetime earnings for a young victim, along with estimates of inflation for purposes of projecting future earnings and discounts to present value. See *Daley*, 287 N.E.2d at 556-57; accord, *e.g.*, *FMC Corp. v. Brown*, 551 N.E.2d 444, 449-51 (Ind. App. 1990) (affirming wrongful death award); *Prange v. Martin*, 629 N.E.2d 915, 922-23

(Ind. App. 1994) (affirming damages award based on estimates of future lost wages and medical expenses over plaintiff's projected life expectancy); *K Mart Corp. v. Beall*, 620 N.E.2d 700, 709-10 (Ind. App. 1993) (affirming damages award for future medical expenses based on life expectancy).

Equitable principles also indicate that, to the extent the circumstances of the parties' positions are uncertain, that uncertainty should be resolved in favor of Ann rather than in favor of Radez, whose malpractice created the problem. See, *e.g., Leigh v. Engle*, 727 F.2d 113, 138-39 (7th Cir. 1984) (in apportioning fiduciary wrongdoer's profits, "while the district court may be able to make only a rough approximation, it should resolve doubts in favor of the plaintiffs. This course should avoid the two unfair results of depriving the defendants of the profits earned by their own efforts or depriving the plaintiffs of any recovery simply because the defendants have made it difficult to disentangle commingled profits."). Delay would serve no purpose other than to continue to insulate Radez from the consequences of his admitted serious mistake.

Unnecessarily protracted litigation is in no one's best interest. It could be many, many years before Barbara dies. It is true that the parties will not know with absolute certainty how much of the trust remains until Barbara's death. But if the plaintiff were forced to wait until that date, this litigation might not be resolved for decades. In the meantime, neither party would be able to get on with his or her life. The plaintiff would be unable to make solid financial plans for her

future, and Radez would suffer from the uncertainty of an unresolved legal malpractice case against him. Ripeness requirements aside, and consistent with the Indiana case law discussed above, the court also takes into account the parties' interests in seeing this matter come to resolution without undue delay.

Accordingly, the court interprets Indiana law to hold that plaintiff Ann Kern's claim for legal malpractice is ripe and that the court must do its best to make a reasonable estimate of damages at this time, allowing for the uncertainties.

The court concludes that plaintiff has done a reasonable job of trying to estimate her damages under the circumstances. Despite turmoil in financial markets, the five percent assumptions for income growth and for the future discount rate are reasonable for the relatively long term at issue, and the two rates at least match one another. Defendant Radez has offered nothing better on those matters. The use of standard actuarial tables for life expectancy is also reasonable, and again Radez offers nothing better.

The tricky problem here is that Barbara has such broad rights to withdraw money from the trust, creating significant uncertainty. Without intending any criticism of Barbara, the court must recognize that the trust gives her discretion to act in her own interest and contrary to Ann's interest as a remainder beneficiary. Is it reasonable to project that Barbara will continue to draw on the

trust at only the same modest rate she did during the first three years, especially if her health care needs were to increase or if any other sources of income would shrink?

Under these circumstances, the best and most accurate way to compensate Ann would be an approach that neither side suggests. The solution would be to require Radez to fund at this time a second "shadow" trust for Ann's benefit. That trust should be funded at a value of five-sixths of the current value of the trust created with Ted Holland's assets. Ann would be the sole remainder beneficiary of that shadow trust. Radez (and/or his malpractice carrier) would be entitled to withdraw from the trust each year exactly five-sixths the amount that Barbara withdraws from the real trust. Upon Barbara's death, Ann would receive one-sixth of the real trust and all of the assets of the "shadow" trust. The two sums should total 100 percent of the residual value of the real trust. By this method, Ann would not receive any money any earlier than she would have received it if Radez had not made his mistake, but she would receive upon Barbara's death as nearly as possible the amount that Ann would have received if Radez had not made his mistake.

This shadow trust approach would require much more capital from Radez up front than immediate payment of Wheeler's estimate of Ann's damages would require. But the shadow trust would also replicate for Ann the risks and uncertainty she would have faced if Radez had not made his mistake. If Barbara

lives past the age of 100 and depletes all the assets in the real trust, Ann might wind up with nothing and Radez would get all of his money back eventually. If Barbara dies in the next year, Ann would receive nearly all of the trust principal. Under this shadow trust remedy, Barbara would not have any special incentive to deplete the real trust (her own children would still receive five-sixths of the remainder), and Radez would benefit from her restraint.[3]

Neither party has proposed this solution, however, and the court will not impose it in the first instance. But the shadow trust solution provides a useful alternative for purposes of comparing the parties' two proposals. Ann's proposal requires some estimates and would have the effect of putting money in her hands much sooner than the correct execution of Ted's and Barbara's instructions would have. Radez's proposal, however, is even less satisfactory. Instead of Ann benefitting from the knowledge that trust assets are being held securely, any hope of future compensation she might have would depend on the uncertain fortunes of Radez's financial circumstances. A future bankruptcy filing by Radez, for example, at any time during Barbara's life, would leave Ann with nothing.

On balance, the court concludes that Ann's proposed remedy, based on Wheeler's estimates, is a reasonable solution to the problem and is the best available to the court. If either party believes that the suggested shadow trust

---

[3]For present purposes, the court also ignores the additional administrative expenses that would be incurred in managing a second trust.

solution is preferable, the court will entertain a prompt Rule 59 motion to that effect.

Radez argued in opposition to default judgment that the trust created upon Ted Holland's death could be "reformed" to correct his mistake and to conform the trust instrument to Ted Holland's actual intentions. Radez has no standing to pursue such a reformation himself. The record before the court shows that such a reformation of the trust would be possible only with the consent of both Ann and Barbara, and probably with the consent of all five of Barbara's children, as well. Over the past two years, the parties and their attorneys have had ample time to reach such an agreed resolution. They have not done so. And this court has no jurisdiction over Barbara or her children. The prospect of a possible future reformation does not provide a valid basis for denying relief here. The Indiana Court of Appeals has held that a victim of attorney malpractice may sue the attorney without first exhausting all other possible remedies. See *Hacker v. Holland*, 570 N.E.2d 951, 953-54 (Ind. App. 1991).

For the stated reasons, the court grants plaintiff Ann Kern's motion for entry of a default judgment and will enter a final judgment against defendant Radez for the sum of $472,852.27.

So ordered.

Date: September 25, 2009

*David F. Hamilton*
_____

                                            DAVID F. HAMILTON, CHIEF JUDGE
                                            United States District Court
                                            Southern District of Indiana

Copies to:

Michael Ryan Hartman
BINGHAM MCHALE, LLP
mhartman@binghammchale.com

Kenneth J. Munson
BINGHAM MCHALE LLP
kmunson@binghammchale.com

Richard A. Rocap
ROCAP WITCHGER, LLP
rar@rocap-witchger.com

Scott Lee Timberman
ROCAP WITCHGER LLP
slt@rocap-witchger.com